That brings us to our final case, Omni Health Solutions v. Zurich American Insurance Co. Mr. DuBose, you will start with 10 minutes. You've reserved 5 minutes for rebuttal, but please try to keep track of your own time. Thank you very much, Your Honor. This is Wilson DuBose, appearing on behalf of Omni Health Solutions, LLC. I'm excited and very grateful to be able to present this argument to the court today. As the court is no doubt aware from reading the briefs, and we are here because the district court granted summary judgment as to all four counts of Omni's complaint against Zurich American Insurance Co. arising from a loss occurrence that occurred in February of 2011 occurring at Omni's facility, a 17,400-square-foot building located in downtown Macon near the campus of the Mercer Law School. The loss occurred from hail damage, and in the ensuing months, there was additional damage that caused the reconstruction of the building to take an extremely long time. We are here because Zurich 1 did not comply with the contract of insurance because it did not issue a determination of coverage and determine how it was going to satisfy that coverage under the contract within 30 days. Zurich instead waited approximately seven months to make that determination, and then after that, because it would not agree to what Omni believed was a reasonable claim settlement, the matter went into the appraisal process. And beyond that, the appraisal process led to litigation in the state courts of Georgia going all the way to the Court of Appeals of Georgia. Now, the basis for the claim, which we call Count 1, that is, Zurich breached its obligation to determine coverage and the amount of coverage in the manner in which it wanted to satisfy its obligations regarding coverage. The trial court stated that Omni did not file suit within the allotted period of time. The contractual limitations period was two years from the date of the incident. This issue was not raised by Zurich until argument on the motion for summary judgment was held in March of 2019. But nonetheless, the trial court seized upon this as a grounds for dismissing the Count 1 of the complaint. The basis for that dismissal was that although it is well settled that the appraisal process told the running of the contractual limitations period, in this particular case, the court found that there was no relationship between the appraisal process and the claim under Count 1. And to that, I would like to stress two different points. One, there is no authority that we could find, and there is no authority that the trial court cited that indicated that an appraisal process could be told with respect to some claims of the plaintiff, but not with respect to other claims. The only authority out there is the appraisal process told the contractual limitations period. Also, with respect to the claim of there being no relationship between the appraisal and Count 1, we respectfully take issue with the court with regard to that ground. Because the purpose of the appraisal for the structural damages was to determine the total amount of the loss upon which the plaintiff's claim in Count 1 was based. The structural appraisal award... I'm sorry, I said the structural appraisal award. I mean the award relating to business income loss and extra expense loss. Do you agree with the characterization of those issues as an extra contractual penalty? Do I agree? No, Your Honor, I do not agree. That's because, first of all, if there was an extra contractual penalty, why would there be an appraisal under the contract? The appraisal is to determine the amount of loss. Not the amount of ultimate liability, but the amount of loss under the insurance contract. And if what we were claiming in Count 1 was extra contractual, if what the appraisal was doing was extra contractual, there would be no grounds for an appraisal at all. The Count 1, the basis for that is that under the contract, it delays seven months getting into action to comply with its obligations. During that seven months, not only was there the original hail damage, but several instances of additional water damage resulting in mold, contamination, and further damage to the building because of what happened in those seven months. Now, the structural award, which we deal with in Count 2, that did cover the cost of the construction, although we contend in Count 2 that they did not pay us the entire amount of that award. But Count 1 is related to the appraisal for business income loss and the appraisal for extra expense because those appraisals determined that the monthly business income loss was $25,699 and the number of months for which that loss had occurred was 40 months. Two minutes remaining. Okay. And with respect to the extra expense loss, you had another time period of 40 months of extra expense. Defendant claims that there's a 13-month limitation in the policy, but we contend that because of the delay, we suffered 40 months. And before your time is up, this is Judge Carnes. Do you want to touch on another part of your issue, which is the summary judgment on the failure to make timely payment in Count 2? Yes, I do. The issue to make timely payment relates to the failure of Zurich to pay all of the amount of the structural award. We contend they were shorted us about $337,000. The trial court contends that there was no ambiguity in the appraisal award. And we contend... It looks like a big mess to me. It's hard to record all this. Let me focus on the important thing. The trial court misinterpreted the record. The trial court was looking at two different documents and it contends that both were the appraisal awards, but neither one was the appropriate award. The only appraisal award is found in his Givet A in Document 38-4, because that is the only one that was signed by both of the appraisers, both Omnys and Zurich. The Court of Appeals stated in Georgia, when the appraisal award went up for consideration by that court, that those two had to sign it because the umpire who also signed it was disqualified. The appraisal awards relied upon by the trial court were not signed. Your appraiser essentially is saying that we have two groups of numbers and the second group of numbers mold and whatever that was. He didn't include that as part of the first. And they're saying everything is consumed in that first estimate. If we agree with you that the district court was wrong to grant summary judgment, and I don't know if you're asking for summary judgment yourself, or I assume you're asking for a jury trial, and if the jury is going to have to unsort which document was the operative document, what are you seeking as ultimate relief on this count? We believe that the trial court should be reversed because it relied on inoperative documents. I know you want them reversed, but do you want them to grant you summary judgment or do you want a jury trial on that? We have not, for the record, asked for summary judgment. We would like a jury trial because we do believe that at the very least after construction of the documents, according to normal rules of construction, that probably the only way to determine what really happened here is to go through the paroled evidence round and for the trial jury to determine what the intent of the document was. And the only document that is of any relevance is the document that is at 30... I'm missing it right now, but the appraisal award signed by both Chris Cole and by Mr. Corley. That is the only one that is relevant. The trial court did not rely on that document. And that document, again, is at 38-4, maybe a bit 80. And so there will be a dispute. Your expert will say, look, it's what I tried to inartfully phrase before. I thought we had two sets of numbers here. I guess their expert will say, no, no, that's not what we meant, and what's the jury supposed to do, figure out what the agreement was? Well, that's a good question. The testimony of our appraiser, Mr. Cole, would be that he added the two numbers to arrive at the total amount of the structural damage award, and then he said that whatever amount we had already paid should be reduced from that. What's the jury supposed to decide here? I think they're supposed to decide the intent of the parties and whether or not the structural award, the amount of loss, is separate and distinct from the numbers at the bottom of the page. And it could be that they determine there was never any meeting in the months because the appraisal process is contractual in nature. What will happen then? Will the court have to turn over the appraisal process if we send it back and is that what's going to happen? It's my view that the appraisal process would have to be re-initiated. Okay, thank you. Okay. If I may just briefly address the count four, which is the opinion testimony issue. Trial court said that the owner of the property was not entitled to express his opinion as to the value of the property, the diminished value of the property, and we contend that that goes against well-settled law that permits owners to testify as to the value of their own property. The trial court indicated that the process that the owner proposed to use was in essence too complicated and was in the realm of expert testimony, which he was not by training an expert. We contend that the cases are clear that any time a layperson wants to testify about the value of his property based on his own knowledge of the property, that that is admissible. The fact that our owner, Dr. Grain, stated that he would be using comparables to look at and determine the value of this property both before and after the loss occurrence here does not elevate it to the realm of... I'm sorry? I'm sorry. Wouldn't the district judge properly be addressing this 701 and 702 question of the federal rules of evidence by looking at federal law, not Georgia law? Isn't it federal law that would govern on the question of whether or not it was manifestly erroneous for the district court to keep him out on the ground that he wasn't sufficiently qualified by background training and expertism as a proper expert on the point he was opining about? Yes, I do believe that would be federal law, Your Honor. And we believe that federal law is consistent with Georgia state law. Georgia state law that we cite in our briefs has held on a number of occasions that it is proper for an owner to look at comparables. Given the fact that even the appraiser can't seem to agree on the nature and amount of the damages, doesn't it seem like this case might be a little bit out of the ordinary where the nature of Dr. Green's testimony was supposed to be the nature of the damage to the building and the resulting mold infestation, the commercial real estate market, all of those things, doesn't that seem a little to require more expertise than your average property owner discussing the value of his or her property? Well, we think not, Your Honor. Let me refer you to the case in which there were five owners of the property and each one submitted an affidavit and each one opined as to the fact that he or she believed their property was, and I quote, worthless since it was polluted by the defendant's chemicals. This, by the way, is Fisher v. Sebo, Specialty Chemicals Corp. cited in our briefs. And each of the plaintiffs, in one way or another, testified that their assessment of the value of the property after it was polluted was worthless because it was polluted and contaminated. Now, we are doing nothing more than that here. Dr. Green is claiming that his property was diminished in value because of the mold that occurred and the water damage that occurred and the excessive time that it took to reconstruct the property. Well, Mr. DeBose, the key on that is, I'm sure he's probably right, it may have been damaged in value, although if remediated, maybe not. But the question is, how does he, a doctor, have any notion how the mold that infested his property, how he was going to monetize or quantify that number? What expertise does Dr. Green have? Well, I think if you look at the trial court's opinion, he, in that opinion, which is, I think, document 77, he cites the proper method for determining the effect of mold remediation on the value of a property. He cites what he views as some experts. And the experts simply say, you go to the property's value before the mold damage occurred, then you take a comparable property that has been damaged by mold and you look at that property and its value in comparison to other properties that have not been damaged by mold. Now, that is something that is not beyond the ordinary realm of understanding of common people. The entire basis for lay opinion testimony under 701 is that it be within the realm of comprehension of average persons. Simply saying that my property was worth a million and a half dollars based on my opinion as an owner, which he's entitled to do under both Georgia and federal law. But after the mold contamination, I believe it's worth a million dollars because other comparable properties are worth a million and a half dollars still. That is something that does not require special expertise. It's simply a matter of logic, which most, if not all, lay persons should be able to understand. Therefore, that would qualify as being a lay opinion under Rule 701. So, our position is, and we believe it's the correct position, that the trial court applied a much too stringent standard in ruling that Dr. Green's testimony, one, was not sophisticated enough to be an expert because his experience was not such that he could be an expert, but also too complex to be a layman's opinion. We contend that it was not too complex at all, and that the trial judge applied the improper standard in ruling that he could not testify as a lay person as to his value both before and after the mold remediation had occurred. How much time do I have left, Mr. Clerk? Your time has expired. You were answering questions for the court. Okay. I thank the court, and I would like to reserve a few minutes for rebuttal. Yes, thank you. Ms. Bailey, you've got 15 minutes. Thank you, Your Honor. My name is Melissa Bailey, and I represent Zurich American Insurance Company. As Mr. Dubose said, this case arises out of a February 2011 claim for storm damage to the roof of a medical facility owned by Omni. It's gone through three appraisal panels, two state courts, the Georgia Court of Appeals, and now the District Court in the 11th Circuit. Zurich has already paid Omni approximately $1.5 million on this claim, yet nearly 10 years later, Omni claims that it still is owed more money. Has the Middle District of Georgia properly determined that Omni's summary judgment in favor of Zurich is proper? First, the District Court correctly determined that Omni's claim for extra contractual damages based on Zurich's alleged delay to render a coverage decision was time barred by the policy's suit limitations provision. Second, the District Court properly determined that Zurich has already paid all amounts owed under the Structural Damage Appraisal Accord. Third, the District Court rightly determined that Omni has failed to prove the essential element of damage on its diminished value claim. And finally, because each of the breach of contract claims fails, the court determined that the bad faith claim also necessarily fails. As to the first count, what is being sought here is extra contractual damages. Let me interrupt you, Ms. Bailey. I don't understand the District Court's position. It's not extra. It's right there in the contract. You're supposed to timely notify. You breached that. That's not extra contractual. It's right in the contract. The damages are extra contractual, though, Judge Carnes, because everybody agrees that the policy limits recovery for business interruption and extra expenses to 13 months. They're trying to use the alleged breach of the notice provision as a way to get 40 months of damages. So they're trying to get an extra approximately 2½, 3 years of damages out of the policy when we all agree that without this alleged failure, they wouldn't be entitled to it. When you say without, this is Judge Grant, when you say without this alleged failure, what alleged failure are you talking about, the 30 days? Yes, the alleged failure to give a coverage decision within 30 days. The District Court found that, as a matter of law, due to a failure to respond to one of the Statement of Undisputed Facts, that the coverage decision was made on March 28, 2011. And based on that, that would be 11 days outside of the 30-day requirement under the policy. And that's another reason why this is an extra contractual damage. This is 10 months before appraisal was ever demanded. We're not talking at this point about what are the damages that flow from the storm damage to the roof. What we're talking about is what penalty should be imposed on Zurich for delaying 11 extra days in rendering its coverage decision. That doesn't have anything to do with how much does it cost to fix the building. It has to do with what penalty over and above what's owed for property damage and business interruption under the terms of the contract should we impose to essentially punish Zurich for failing to meet this obligation. It's like a bad faith claim. In a bad faith claim, it arises from the policy because the courts have read into each policy a duty of good faith and fair dealing in the contract. But the penalty that is imposed on a bad faith claim is extra contractual. It's not damages that arise. And I think they're going to have an uphill climb on this if we do reverse. But my understanding is they're saying that your delay in notifying them, which they think is longer than 11 days, but they say your delay actually contributed to a delay in the appraisal process, which contributed then to rain and other things happening. So I think they're not saying it's just bad faith that they suffer damages, which, once again, may be a heavy lift for them if we remanded this. But you agree that it's in the contract, so they have a right to sue based on you being late in notifying them. And it seems to me my understanding of reading this, though, is that the appraisal, their argument is that the appraisal process was a tolling of the 2-year period of time, which I think you'd agree is generally true. And as Mr. Dubose said, the appraisal was not just for losses that may be covered. The appraisers don't decide what's covered and not. They just decide losses. And so that amount of loss would be something that necessarily, before you could have a suit deciding the amount of damages based on the late notification, you have to go through the appraisal process. Why is my thinking on this wrong? Your Honor, the reason we disagree with you on that point is because the damage, whatever it was, to the property, was done on March 28, 2011, which is the date that the district court said as a matter of law is the date that the coverage decision was made. There wasn't even an appraisal demand for 10 more months after that. And the damages that were set by the appraisal process were how much did it cost to fix the building and how much money did your business lose while the building was being fixed. They made no determination as to whether or not those damages were exacerbated by this delay, and they also made no determination as to whether or not a penalty should be imposed. It's completely separate. But they made the key finding, and again, plaintiffs have an uphill battle, but their uphill battle is that we're going to say for X number of months we had more delay than we should have because you delayed in your notification, and the appraiser decided exactly what you need to know for damages. They decided per month what the amount of business loss was. So they're not going to plug it in or decide whether this first claim is any good or not, but they gave you the figure and how. Essentially, you're saying there should have been two lawsuits. They should have filed a lawsuit within two years of the late notification, and then down the road, years down the road, file a second lawsuit based on the appraised coverage loss. Is that what you're arguing? That's exactly what we're saying, Your Honor, because it's two completely separate claims. The first claim was right at the time that Zurich made the coverage decision, and I understand they're taking the position that it was later in 2011, but everybody agrees that a coverage decision was made months in advance of an appraisal demand. And so whatever damage there was for a delay had already occurred at that point because once the coverage decision was made, we weren't dealing with that anymore. So what we were dealing with at that point was how do we remediate the property? What is it going to cost to remediate the property? So any claim for damage by virtue of that delay became ripe on the day the coverage decision was made. These other claims that they're bringing now didn't become ripe until the last couple of years because they're arguing that the appraisal award was not satisfied. So these are two completely, in our opinion, you're comparing apples to oranges. Whatever the penalty or damage was due to an allegedly delayed coverage decision has no bearing on whether or not the appraisal award was paid. I understand that counsel wants to use the appraisal award as a measure of damages for what they should be awarded extra contractually for this delay, but that's not a one-two process. That's their goal, is to convince a jury one day that that is the proper measure of damages, but there's nothing in the policy that says, and if we fail to provide you with a coverage decision within 30 days, then you get X, Y, and Z. That's just their argument. But that's an argument that may be a dead loser, but it's an argument, and it's an argument that if it's not a dead loser, we'll be informed by what the appraiser decides would be the loss per month for business loss. Correct? I agree that it's an argument, Your Honor, but I guess our point here is that how can a claim that was ripe 10 months before appraisal was even demanded be governed by the appraisal process? At the time this claim was ripe, no-one was even talking about appraisal. We hadn't started appraisal, no-one had asked for appraisal. So why is it, then, that something that wasn't even requested until 10 months later, and that I believe everybody agrees is not directly related to whether or not there was damage from this alleged delay, to hold that claim? I mean... Wouldn't that rule that you're setting out apply broadly to any appraisal claim? Is the tolling process limited in that manner under Georgia law? So what we have heard... We admit that there is generally a tolling for appraisal, but the National Union Fire case that is cited by plaintiffs says that the reason that tolling applies is because if they're suing for those damages that flow from the need to repair the property, those damages are being set in the appraisal process, and they have to have the award. But here it's a completely separate inquiry. The inquiry here is, is the damage worse because of this delay? And that is just not an issue that was before the appraisal panel, and it has nothing to do with the appraisal award. And there's a case, Thornton v. Georgia Farm Bureau, that is a Georgia Supreme Court case, and it's admittedly not a case about appraisal, but it is a case about tolling. And what the Georgia Supreme Court said there is that tolling only applies in the suit limitations provisions contained in an insurance policy if there's some necessary occurrence to fix the measure of damages. And that applies... In our mind, that applies here. Nothing about the appraisal process fixed the damages for the alleged delay in the time to provide a coverage decision. It's an extra contractual penalty that a court may or may not impose if they got the merits of it, got to the merits of it. But nothing about the appraisal process definitively fixes those damages. It would be up to that fact finder to determine what damage, if any, was attributable to that delay. And, of course, they may look at the appraisal panel as some persuasive authority on that issue, but it certainly wouldn't govern. It would just be an argument that Omni would be able to make. And so what's Varick's argument about the reasons for the delay in repair? What did you say the cause of that delay was? We don't believe there was a delay in the repair, Your Honor. The claim was initially denied. And then in September of 2011, it was reported again, initially opened under a new claim number, and coverage was accepted on site when they went out and found new damage. At that point, Varick immediately started making payments on the claim. And there's no allegation here that they didn't immediately start making payments on the claim once coverage was accepted. The issue was that Omni disagreed with the amounts that Varick agreed to pay. And at that point, since they couldn't reach an agreement on how much money was owed to remediate the property, Omni elected to demand appraisal, and those issues went to the appraisal panel. Was coverage accepted? My understanding is that coverage was accepted based on liability for the original event, not based on some new event that happened in September. Am I misunderstanding anything there? You are, Your Honor. I would direct your attention to docket 25A, page 61. That's Michael Farrandon's deposition. Mr. Farrandon is the person who inspected the property the first and second time, and he indicated that when he went out and inspected the property for the second time in September 2011, that the condition of the roof had changed. And at that point, he did see storm damage, and on the spot agreed to extend coverage for that loss. So as the inspector for Zurich, Mr. Farrandon has testified that it was, in fact, different. And it was, in his view, a new claim at that point. Okay. Thank you. How do you handle the argument of plainness that we shouldn't even be talking about this because you all never raised this as an affirmative defense, the untimeliness of this particular claim, you never raised it in your opening summary judgment brief, I believe you first raised it in a reply or at the hearing, and they say you were out of time on that. What is your response? Your Honor, as to the first issue, it's not a statute of limitations, so it was not required to be pled in our answer under Rule 8. Under Rule 9, even if it was required to be pled, this court has said in Associated Contractors v. Martin Eby, then it can be amended, that defect can be amended by raising the issue in a motion for summary judgment. As to the second point, we admittedly did bring this issue up in the summary judgment hearing, and Judge Self, after hearing the argument, instructed all parties to brief the issue. He made the decision that he wanted it briefed because he thought it was integral to his decision, and he requested that we file an amendment for summary judgment to address that issue. So it's our position that this was done with the express leave of the court, and therefore we were not barred from bringing this argument when we did. Could you talk about this confusing award with umpires coming and going and attachments here, attachments not there, and how the heck we're supposed to figure out what the award really was? I will do my best, Judge Karnes. So everybody agrees that whichever, they're calling it versions of the document, this was a situation where everybody signed the award electronically. So depending on whose email you pulled it on, you may have two signatures on it, you may have three signatures on it. But we all agree that ultimately the umpire and both appraisers signed this document. That is not disputed. On all versions, again, whether it's signed by two people or three people, it lists an RCV of approximately $886,000 and an ACV of approximately $804,000. At the very bottom of that document, there's a table that breaks out boulder mediation and code upgrades. Now, Mr. Cole says he thought that that was in addition to the RCV and ACV listed at the top. Mr. Wosden, who is the one who actually drafted the award as the umpire, has disagreed with that. And Mr. Corley, who was Dirk's umpire, also disagreed with that. But even just looking at the face of the document, it doesn't make sense. An RCV is the cost to replace a property, by definition. Why would you have a cost to replace the property listed next to RCV that doesn't include code upgrades or boulder mediation? Obviously, those are necessary components of replacing a property. But even if you do believe that that cover page is ambiguous, we have the backup documentation for how they got to those numbers. Again, Mr. Wosden was the umpire. He's the one who drafted the estimate that the award was based on. He is given an affidavit where he provided his estimate, which is 114 pages long. And I see my time has expired. May I briefly address this last issue? Yes, you can address it as long as you need to. And in that 114 line estimate, when you get to the last four pages of it, we start to get some totals. There is a total for boulder mediation, and that matches the total that's on the cover page. Then there's a total for code improvements. That also matches the total that's on the cover page. And then they add up all of those line item totals, including boulder mediation and code upgrades. They're labeled for us. And we reach the numbers that are at the top of the page, the $886,000 number and the $804,000 number. Now, I understand that Mr. Cole, who's Omni's appraiser, says, well, that's not what I understood. But what's interesting about that is, if you look at Mr. Cole's deposition testimony on page 72, he's the one that actually produced that estimate. He produced it to us at his deposition, and he said, yeah, this is Mr. Wosden's estimate that he used to back up the award. He testified to that. Because Mr. Wosden has been disqualified for partiality, can we rely for these purposes on anything from Mr. Wosden? We have to, because Mr. Wosden's the one that wrote the award, and Mr. Wosden's the one that wrote the estimate. This wasn't a baseball arbitration situation where the two appraisers submitted numbers and Mr. Wosden had to pick one. He was free to use his own discretion, and, in fact, he did use his own discretion, and he came up with a third number, and everybody signed on to it. And so I understand that he ultimately stepped down, but the award has been upheld as binding by the Georgia Court of Appeals. And in my opinion, it's not ambiguous on the face at all, because, again, what does an RCV mean? It means the cost to replace the property. And why would a replacement of a property not include code upgrades and motor mediation? But if you do think it's ambiguous and you go to the parole evidence, well, we have 114 pages of numbers that everybody agrees they had copies of because Mr. Cole produced it at his destination that coincide exactly with the numbers on the cover page. Are you saying that if we need to, if we've determined that it's ambiguous, are you suggesting that we make that decision on the parole evidence, or wouldn't a jury need to make that conclusion? Well, the district court judge ruled in the alternative. He said it is not ambiguous on its face and the amounts have been fully paid, but then in a footnote he said, and in the alternative, if the court must look to parole evidence, it is satisfied that this 114-page line-item estimate where the numbers correspond is sufficient evidence of the intent of the parties. So he's actually already made that ruling in the alternative. Thank you. Any other questions from the panel? No. All right. Thank you, Ms. Bailey. Mr. DeBose, you've got five more minutes. Okay. Let me first address what was just discussed by Ms. Bailey. She keeps referring, and the trial court also kept referring to the 114-page document. That document was prepared as an estimate by Mr. Boston, who was the umpire, who was disqualified from participating in the appraisal process. So how can that estimate possibly be a part of the award, particularly when the only valid document which constitutes the award is found as Exhibit A to 38-4? And that is the award as signed by Mr. Cole, the appraiser for Omni, and Mr. Corley, the appraiser for Zurich. That award has nothing attached to it. That award does not refer to any 114 pages of estimate. It doesn't incorporate 114 pages of estimate. It doesn't incorporate anything. It is simply the award, that one-page document, which the trial court erroneously refers to as a cover sheet, but it's not. It's not a cover sheet. It's the award. The trial court simply erred in finding that the other award not signed by Cole and the 114-page document constituted the award. This is not part of the record here and cannot be considered in determining the meaning of the award. If anything, Mr. Cole said that he added the top numbers and the bottom numbers to arrive at the total loss. And then he said he did that because he didn't know how much had already been paid by Zurich and that the amount that had already been paid by Zurich would have to be deducted from the sum of the top number and the bottom number. And that is entirely consistent with what we're saying. We have not been paid the entire amount owed because Zurich didn't add the bottom and the top numbers together like Chris Cole did. I'd be curious, since we've got limited time, to know your response to opposing counsel's argument that the delay in making a coverage decision had no impact on the damages that are characterized as extra-contractual. I'm not saying you need to agree with that characterization, but what about the argument that the delay that you're asserting had nothing to do with those damages? Well, obviously I disagree with it. The appraisal for lost profits and for additional expense came up with 40 months of delay. It's not delay, then 40 months of lost profit and additional expense. We contend that even though the policy provides for a 13-month cap, that nonetheless, the 40 months found by the appraisers does constitute the benchmark by which we need to establish on these damages for the failure of Zurich to make a coverage determination timely. And we do deny that the coverage determination was made on March 28th. In fact, Perundum, the adjuster, said he didn't have even the authority to do that. And Zurich admits that they made the coverage determination in September of 2011. Did the district court make any finding of facts about the March date as the coverage decision date? The district court determined that in our response to their statement of material fact that we did not unequivocally deny that that was the date on which coverage was communicated. We did not agree with it and we did not... I need to go back to the document to see what we exactly said, but it was not an agreement and it was not something that we believe could have been construed as admitting that was the case because in our very same documents on the summary judgment response, we harped on the fact that September 2011 was the date based on what Zurich has already admitted to. So we believe that if that was the factual determination by Zurich itself, that it was not supported by the evidence. Thank you. So we do believe that under count one, there was no basis for the court to determine that the tolling during the appraisal process did not apply because there's no authority for it. Thank you. Thank you, Your Honor. Thank you, counsel. Thank you. That brings us to a close for today. Thank you to all the counsel who were able to assist us in learning about these cases and we're adjourned until tomorrow.